UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------X
KIM PERSKY,                        :
          Plaintiff,               :
                                   :
          v.                       :    NO. 3:99CV2273 (EBB)
                                   :
CENDANT CORPORATION,               :
                                   :
          Defendant.               :
----------------------------------X
```

## RULING ON PLAINTIFF'S MOTION FOR LIQUIDATED DAMAGES

Plaintiff Kim Persky ("Plaintiff" or "Persky") moves this court for an award of liquidated damages under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2617(a). For the following reasons, the Court awards Plaintiff liquidated damages in the amount of $496,344.

## Factual Background

The following facts consist of those deemed necessary to an understanding of the issues raised in, and decision rendered on, this motion. The facts are culled from prior decisions from the Connecticut Department of Labor, Connecticut Superior and Supreme Court, and this Court, as well as from the hearing held by this Court on October 30, 2007, the relevant memoranda of law, and the exhibits attached thereto.

Defendant Cendant Corporation ("Defendant" or "Cendant") is a corporation that provides global business and consumer services. It was created following the merger of two other corporate entities in 1997. Plaintiff began working for one of these predecessor

companies in 1989, and continued to be employed in a management position following the merger. In May 1998, Plaintiff was promoted to Vice President and General Manager of Cendant's Sidewalk business unit ("Sidewalk"), which had been created as a joint venture between Cendant and Microsoft Corporation ("Microsoft"). In this capacity, Plaintiff oversaw the operations of the Sidewalk unit and managed its profits and losses. In June 1998, Cendant granted Microsoft the option to purchase the Sidewalk sales unit. In November 1998, Plaintiff notified her supervisor that she would be requesting maternity leave beginning in January 1999. Jonathan Yee ("Yee") was selected as a "placeholder" for Plaintiff while she was on leave. <u>Persky v. Cendant Corp.</u>, Conn. Dept. of Labor, Case No. FM 99-50, Proposed Decision, p. 9 ¶ 38, Sept. 18, 2002 (hereinafter "DOL Dec."). Plaintiff worked with Yee to acquaint him with her job responsibilities. In January 1999, Plaintiffs was reviewed favorably and was recommended for a raise.

On January 25, 1999, Plaintiff began an approved maternity leave. In February 1999, while Plaintiff was on leave, Microsoft exercised the purchase option, with an agreement between the two corporations providing that the transition process would be completed by December 1999. As a result of the sale of the Sidewalk sales unit to Microsoft, approximately 300 employees were

laid off in early 1999. Tr. at 20-22, 27, 79.[1]  However, the
transition agreement specified a handful of employees, including
Yee, that Microsoft wanted to keep at Sidewalk as part of a
"transition team".   The transition agreement did not contain any
provision eliminating Plaintiff's position or preventing her from
being retained.  Findings of Fact of Conn. Dep't of Labor Hearing
Officer Lee Ellen Terry (hereinafter "DOL Findings") ¶ 61.   An
appendix to the transition agreement stated that the services
Cendant would provide to Microsoft were "substantially similar to
those which Cendant provided pursuant to the Prior Agreement".
Tr. at 74, 80, 84, DOL Dec. ¶¶ 68, 103.  This transition team was
ultimately laid off in December 1999.

Plaintiff was informed of the sale of the Sidewalk unit in
March 1999, and was told that Yee would be fulfilling Cendant's
obligations to Sidewalk until December 1999.  She was directed to
contact Human Resources, where she was told that her position had
been eliminated.  Plaintiff was offered the opportunity to apply
for several positions within Cendant's new management structure,
but no specific replacement position was explicitly offered to her.
In July 1999, Cendant told Persky that her failure to accept any of
these positions was being interpreted as voluntary resignation from
the company.  Def. Ex. 11.

---

[1]All references to "Tr." relate to the October 30, 2007 hearing
transcript.

## Procedural History

On November 11, 1999, Plaintiff filed a complaint with the Connecticut Department of Labor ("CTDOL"), alleging that Defendant violated provisions of the Connecticut Family and Medical Leave Act ("CFMLA"), Conn. Gen. Stat. § 31-51kk, *et seq.*, by failing to reinstate her to her previous position following maternity leave. On November 22, 1999, Plaintiff filed suit in federal court alleging, among other things, that Defendant violated the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2). In September 2002, the CTDOL issued a decision in favor of Plaintiff, awarding her $496,344 in damages. This damage award reflected (1) what Plaintiff would have made if she continued to work from May 25, 1999 to December 31, 1999 ($83,742), (2) severance pay ($52,338), (3) compensation for lost stock options ($82,291), (4) the performance and stay bonuses Microsoft paid to Yee during the transition period ($208,371) and (5) the interest on the above pro-rated amounts through October 15, 2001, calculated at 10 percent per annum under Connecticut General Statute §37-3a ($69,602). Defendant appealed the CTDOL Dec. to the Superior Court, and then to the Supreme Court, both of which affirmed the DOL Dec.. <u>See Cendant Corp. v. Comm'r of Labor</u>, 276 Conn. 16, 883 A.2d 789 (2005). Having exhausted its appeals on the state claims, Defendant paid Plaintiff the CTDOL judgment of $496,344.

Plaintiff then filed a motion for summary judgment in this

Court on her FMLA claim, requesting that preclusive effect be given to the state court judgment, and requesting liquidated damages, interest, and attorneys' fees under the FMLA. [Doc. No. 80]. Cendant cross-moved for summary judgment, asserting that *res judicata* barred Plaintiff from seeking additional remedies in federal court after receiving judgment in the state forum. [Doc. Nos. 84-85]. Cendant further asserted that, even if *res judicata* did not apply, Plaintiff was still precluded from receiving liquidated damages because it was not an available remedy under the CMFLA. <u>Id</u>.

In an April 24, 2007 ruling, this Court denied Cendant's motion for summary judgment and granted Plaintiff's motion for summary judgment in part. [Doc. No. 90]. The Court held that collateral estoppel barred Cendant from relitigating its liability, because the facts found by the CTDOL regarding Cendant's violation of the CFMLA also established a violation of the FMLA. However, because the remedy of liquidated damages is only available under the FMLA, the Court concluded that Cendant did not have the opportunity or incentive to fully and fairly litigate this issue in the state forum. Accordingly, the Court held a hearing on October 30, 2007 on the issue of whether Defendant could avoid an award of liquidated damages under the FMLA by demonstrating that it acted in good faith and reasonably believed that its actions did not violate the FMLA at the time of its decision to deny Plaintiff

reinstatement.

## Standard of Review

The FMLA provides that an employer "shall be liable" for liquidated damages when it interferes with an employee's substantive rights under the Act. 29 U.S.C. § 2617(a)(1)(A). Under the Act, liquidated damages are an amount equal to the compensation denied or lost to an employee, plus interest, by reason of the employer's violation of the statute. Id. "Doubling of an award is the norm under the FMLA, because a plaintiff is awarded liquidated damages in addition to compensation lost." Nero v. Industrial Molding Corp., 167 F.3d 921, 929 (5th Cir. 1999). "The deterrent of double damages found in the FMLA . . . prevents employers from gambling on their ability to evade providing coverage, and therefore, acts as insurance that employees will not be denied FMLA benefits." Rhoads v. F.D.I.C., 956 F. Supp. 1239, 1262 (D. Md. 1997), aff'd in part, rev'd in part on other grounds, 257 F.3d 373, 11 (4th Cir. 2001); see also Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999) ("[l]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the [the statute].").

A court may decline to impose liquidated damages only where the employer "proves to the satisfaction of the court that the act

6

or omission which violated [S]ection 2615 was in good faith and that [it] had reasonable grounds for believing that the act or omission was not a violation . . .". 29 U.S.C. § 2617(a)(1)(A)(iii). "The employer must therefore show *both* good faith *and* reasonable grounds for the act or omission." Chandler v. Speciality Tires of America, Inc., 283 F.3d 818, 827 (6th Cir. 2002) (emphasis in original). Even if an employer can demonstrate that it falls under this exception, the district court's discretion to reduce an award of liquidated damages "must be exercised consistently with the strong presumption under the statute in favor of doubling." Rhoads, 956 F. Supp. at 1262.

As both parties note, there are few cases discussing FMLA's liquidated damages provision in detail. However, because the provision mirrors the liquidated damages provision under the Fair Labor Standards Act ("FLSA")[2], "courts considering liquidated damages under FMLA have looked at cases under the FLSA." Palma v. Pharmedica, No. 3:00CV1128, 2003 WL 22750600, at *1 n.2 (D. Conn. 2003) (citing cases); see also Chandler v. Speciality Tires of America (Tennessee), Inc., 283 F.3d 818, 827 (6th Cir. 2002) ( "the remedial provisions of the FMLA mirror those of the [FLSA]"); Frizzell v. Southwest Motor Freight, 154 F.3d 641, 644 (6th Cir.

---

[2] Compare 29 U.S.C. § 2617(a)(1)(A) (quoted above) with 29 U.S.C. § 260 (a court may refuse to award liquidated damages under the FLSA "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that [it] was not a violation of the [FLSA]").

1998) ["the legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA," citing S.Rep. No. 103-3, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA.... The relief provided in FMLA also parallels the provisions of the FLSA.")].

"To establish 'good faith,' a defendant must produce 'plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it.'" Reich v. Southern New England Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997), quoting Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987) (discussing the liquidated damages provision under the FLSA). "'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of [the law] and then move to comply with them." Id. at 71. In addition, the reasonableness requirement "imposes an objective standard by which to judge the employer's conduct." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907-08 (3rd Cir. 1991) (discussing the liquidated damages provision under the FLSA).

In short, the employer bears the burden of establishing both "subjective good faith and objective reasonableness." Reich, 121 F.3d at 71; see also Cooper v. Fulton County, Ga., 458 F.3d 1282, 1286 (11th Cir. 2006) (stating that "if . . . the employer

8

subjectively acted in good faith but its conduct was objectively unreasonable, then it is not an abuse of discretion to award liquidated damages."). This burden "is a difficult one to meet, . . . and double damages are the norm, single damages the exception." Reich, 121 F.3d at 71; see also Rogers v. City of Troy, 148 F.3d 52, 56 n.2 (2d Cir. 1998) (stating that the good faith exception under the FLSA "has been construed narrowly . . ."). "'Even assuming that [the employer] acted in good faith the decision to award liquidated damages is still within the discretion of the trial court." Palma, 2003 WL 22750600, at *2, quoting Nero v. Industrial Molding Corp., 167 F.3d 921, 929 (5th Cir. 1999).

## Discussion

The issue in this case is whether the Defendant acted in good faith and had reasonable grounds for believing that its actions were not a violation of the FMLA.

The FMLA statute provides that any person who takes FMLA leave "shall be entitled, on return from such leave-(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status, [and]

must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. 825.215(a)[3].

However, an employee has "no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. 825.216(a). For example, "if an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to . . . restore the employee cease at the time the employee is laid off." Id. Thus, under the FMLA, the right to reinstatement is not absolute, but "'simply guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions.'" Cendant, 276 Conn. at 24, 883 A.2d at 794, quoting Liu v. Amway Corp., 347 F.3d 1125, 1132 (9th Cir. 2003).

Defendant argues that as a result of "tumultuous changes within Cendant, including the sale and wind-down of the Sidewalk unit", it believed that Plaintiff's position had been eliminated during her leave, and no other comparable positions were available. Def's. Mem. at 1-2, 6 [Doc. No. 112]. Thus, according to Defendant, it acted in good faith and had reasonable grounds for believing that Plaintiff was not entitled to reinstatement. Plaintiff counters that it was clear that her position continued to

---

[3]The DOL regulations interpreting the FMLA statute, 29 C.F.R. § 825.215, came into effect on April 6, 1995. 60 Fed. Reg. 6658-01.

exist after she concluded her maternity leave because it was being performed by Jonathan Yee, and that Cendant's "failure to research the facts of the situation, including [Plaintiff's] job duties before her leave, Jonathan Yee's duties as the temporary replacement, and Cendant's obligations under the Microsoft transition" was objectively unreasonable and provides no basis for finding that it acted in good faith. Pl's. Reply Mem. at 2 [Doc. No. 113].[4]

At the time of Plaintiff's maternity leave, Attorney Kirsten Hotchkiss was the senior employee relations attorney for Cendant. Tr. at 16. She was familiar with the FMLA, having assisted in drafting Cendant's legal absence policy to ensure that it complied with the statute and having developed a training program for supervisors to ensure they understood their obligations. Tr. at 18. She also regularly advised the human resources department when

_____

[4]Defendant claims that "this [liquidated damages] proceeding concerns *only* Cendant's intent", and, as such, the CTDOL's findings concerning Plaintiff's "alleged qualifications to transition the Sidewalk unit to Microsoft and wind-down that business" are irrelevant because they go "only to the issue of Cendant's *liability*, and says nothing about the issue presently before the Court – Cendant's good faith attempt to comply with the law." Def's. Mem. at 1, 21 [Doc. No. 112] (emphasis in original). However, the Court must also consider whether Cendant had reasonable grounds for believing its actions were not a violation of the FMLA, and, as noted above, "this is a requirement that involves an objective standard." Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 464 (D.C. Cir. 1976) (under FLSA); see also Herman v. RSR Sec. Services Ltd., 172 F.3d 132, 143 (2d Cir. 1999) (holding that "[b]ecause appellant failed to prove both subjective good faith and objective reasonableness, liquidated damages were properly assessed against him [under the FLSA]"). The circumstances surrounding Plaintiff's FMLA leave – for example, the fact Jonathan Yee performed duties that were "substantially similar" to hers – are highly relevant in determining whether Defendant had objectively reasonable grounds for believing that Plaintiff was not entitled to reinstatement.

questions arose concerning FMLA leave.  Tr. at 18.  She testified that she regularly consulted the statute's regulations when giving advice and kept a paper copy of them on her desk.  Tr. at 20.

Ann Collins was a senior vice president in Human Resources at Cendant.  Def. Ex. 12 at 31[5].  Ms. Collins was also familiar with the FMLA, having taken several training courses that dealt with the statute.  Def. Ex. 12 at 30-32.  Shortly after joining the company in March 1999, Ms. Collins learned  that Plaintiff, then out on maternity leave, would soon be ready to return to work.  Def. Ex. 13 at 28.  Ms. Collins' understanding was that Yee had temporarily replaced Plaintiff during her leave.  Def. Ex. 13 at 83.  Ms. Collins spoke to Michael Wargotz, Plaintiff's manager, who informed her that Plaintiff's position no longer existed  and that there were no other comparable positions available.  Def. Ex. 13 at 30.  Mr. Wargotz erroneously thought that Plaintiff was the Vice President of sales at Sidewalk, DOL Findings ¶ 73, while in fact she was the Vice President and General Manager of the Sidewalk Unit.  Ms. Collins also did not fully understand Plaintiff's job title and responsibilities.  See, e.g. Collins Oct. 23, 2001 Test. [Doc. No. 110 at 12] (Ms. Collins stating that she did not know that Plaintiff was a general manager); Id. at 18-19.  Mr. Wargotz directed Ms. Collins to speak to Michael Monaco, chairman and CEO

---

[5]"Def. Ex." refers to the exhibits submitted by Defendant at the October 30, 2007 hearing.

of the direct marketing business, who, according to Ms. Collins, "supported what Mr. Wargotz said, that there was no role, in terms of what [Plaintiff] used to do with Sidewalk not existing any longer, that was being done by Microsoft." Def. Ex. 13 at 31. However, Ms. Collins did not have any discussions with anyone from Microsoft. Collins Dep. March 13, 2001 [Doc. No. 109 at 13]. In addition, although she spoke to Yee on various occasions, their discussions concerned administrative matters, not questions about the job duties he was performing. Collins Oct. 23, 2001 Test. [Doc. No. 110 at 15]. In addition, she never discussed the terms of the transition agreement with Mr. Wargotz or Mr. Monaco. Id. at 12.

Ms. Collins discussed Plaintiff's situation with Attorney Hotchkiss. From these conversations, and from her role in drafting the termination announcement to employees impacted by the sale, Attorney Hotchkiss concluded that Plaintiff's position had been eliminated. Tr. at 26. Notably, neither Ms. Collins nor Attorney Hotchkiss read the transition agreement, which provided that the services Cendant would provide Microsoft during the transition would be substantially similar to those provided under the prior agreement when Plaintiff was the general manager. Tr. at 41; Collins Oct. 23, 2001 Test. [Doc. No. 110 at 24]. Although Attorney Hotchkiss testified that Yee's duties changed to wind down the business and transition it to Microsoft to explain why she

believed his position was different from Plaintiff's, she never spoke directly to Yee to find out what duties he was actually performing. Tr. at 41. Similarly, Ms. Collins' opinion that Yee's position changed to a wind-down function was based not on actually asking him about or viewing the duties he performed, but on her general experience that "when you sell a company . . . that transition period is to wind it down and transition it to the new owners." Collins Oct. 23, 2001 Test. [Doc. No. 110 at 26]. Had either of them spoken to Yee, he would have told them that that he was performing the same duties he had been performing prior to the Microsoft sale. <u>See</u> DOL Dec. at 27. As of May 1999, Attorney Hotchkiss was not familiar with Yee's background, or why he was selected to replace Plaintiff. Tr. at 52. In addition, nobody bothered to determine whether Plaintiff had any experience in winding down a business.[6] Tr. at 43.

In an April 16, 1998 phone call to Plaintiff, Attorney

---

[6]The DOL found that the Plaintiff had had some experience eliminating programs while she was managing Cendant's dining club services. In addition, it noted that "[h]andling drastic changes due to reorganizations and sales of businesses is reasonably expected of upper managers and the record shows no evidence that the [Plaintiff] was unwilling to assume any difficult or complicated responsibilities." DOL Dec. at 31. It found that "the [Plaintiff's] excellent track record with CUC, one of Cendant's predecessors, and Cendant, including her rapid rise in status, her experience with handling a variety of different high level positions, and her excellent educational qualifications are sufficient to conclude that the [Plaintiff] was well qualified to handle the transition period with its decreasing level of pressure and responsibilities." DOL Dec. at 28. In fact, it noted that "Yee's duties during the transition were management duties typical of any business which is winding down," and that because Plaintiff "was more familiar than Yee with Sidewalk's business operations . . . there [wa]s no reason why she would not [have been] capable, if not more capable, in transitioning the various units to Microsoft." DOL Dec. at 27.

Hotchkiss informed Persky that her position had been eliminated. Attorney Hotchkiss' contemporaneous notes from the phone conversation indicate that Plaintiff characterized this claim as "flawed" and "a crock". Def. Ex. 3; Tr. at 60. Despite Plaintiff's reaction, Attorney Hotchkiss took no action to determine whether or not there was any truth to Plaintiff's assertion. In fact, according to Attorney Hotchkiss:

> "If somebody is saying to me, it's a crock of whatever, I'm not going to treat that as something that I'm going to say 'oh goodness you must be right and I'm wrong.' This is really somebody expressing an emotional feeling. And so, I probably didn't go back [to take another look at whether the position had been eliminated] because I felt that I had the facts that I needed to have to communicate the company's position." Tr. at 61.

Similarly, when Plaintiff's attorney sent a letter stating that there were substantial reasons to question the assertion that the job had been eliminated, Def. Ex. 4, Attorney Hotchkiss dismissed this letter as "posturing" because "if [Plaintiff] had facts to support that contention, she would have put them in this letter." Tr. at 62. Thus, instead of investigating whether there was a possibility that Plaintiff was correct, Attorney Hotchkiss responded in a letter dated May 21, 1999 that Yee's position was "in *all* respects a different function (simply stated, her job was to manage an ongoing business, his is to close down a business.)" Def. Ex. 8 (emphasis added). As the DOL found, this description of Yee's position was erroneous. Had anyone asked Yee about his

15

duties, they would have learned that he oversaw Sidewalk's ongoing operations, billing, merchant service, financial operations, information systems, and maintenance during the transition – all functions that Plaintiff had managed prior to her maternity leave. DOL Findings ¶ 66.

Also in this May 21, 1999 letter, while disclaiming any liability under CFMLA or FMLA, Cendant stated that there were several Vice President positions available for which the corporation would "welcome [Plaintiff's] reinstatement" in order to avoid litigation and allow her to reenter the workforce. Def. Ex. 8. The letter claimed that these positions carried the same title, pay status and benefits which Plaintiff had been paid prior to the commencement of her leave. Def. Ex. 11. However, Attorney Hotchkiss never actually read the job descriptions for any of these positions. Tr. at 56. After initially expressing skepticism that the positions actually existed because they had not been posted, Plaintiff spoke to various senior Vice Presidents about them. She decided that none of the positions were suitable because none had a similar level of profit and loss responsibility, the same direct access to upper management, or the same status she had in her position as general manager of Sidewalk. DOL Findings ¶ 97. One of the positions' salary range was below the salary she had been earning prior to her maternity leave. Id. at ¶ 92. In addition, none of the positions had vice president level personnel reporting

to it, as Plaintiff had had in her position at Sidewalk. <u>Id</u>. Furthermore, while Cendant assured Plaintiff that she would promptly return to work upon her selection of a position, Def. Ex. 8, at least two of the senior vice presidents she contacted indicated that they were not anxious to fill the position, and at least one of the senior vice presidents was not expecting to hear from her. <u>Id</u>. at ¶¶ 91, 92. Thus, as the CTDOL found, Cendant's offer "did not turn out to be an offer of a definite position, since when [Plaintiff] contacted the hiring executives, she was not free to select" among the positions but was only invited "to apply for/interview for those positions." DOL Dec. at 33. After Plaintiff informed Cendant that she was not willing to apply for any of these positions, the company responded it had "no alternative but to accept Ms. Persky's resignation from employment", and expressed "regret that Ms. Perksy was not willing to reenter the workforce." Def. Ex. 11.

There is no dispute that Plaintiff was a covered employee under the FMLA. In addition, it is clear that Defendant understood that its obligation under the FMLA and its regulations was to restore Plaintiff to her original or an equivalent position of employment, unless Plaintiff would have been terminated during her maternity leave. <u>See</u>, <u>e.g.</u> Tr. at 46, 52  The question in this case is whether Defendant, who understood the requirements of the statute, took reasonable steps to comply with it. <u>See</u>, <u>e.g.</u>

<u>Herman v. RSR Servs. Ltd.</u>, 172 F.3d 132, 142 (2d Cir. 1999)

(awarding liquidated damages under the FLSA where defendant "had

extensive knowledge of the FLSA's requirements, but utterly failed

to take the steps necessary to ensure [defendant's] practices

complied with the Act.").[7]    Based upon Defendant's failure to

adequately investigate the circumstances surrounding the sale of

Microsoft, including Plaintiff's and Yee's respective duties, and

the transition agreement, the answer is no.

Assuming *arguendo* that Cendant honestly believed that

Plaintiff would have been terminated during her leave, and was thus

not entitled to restoration of employment, the grounds for this

belief were objectively unreasonable.  Cendant's counsel and human

resources department failed to investigate adequately whether

Plaintiff's position had indeed been terminated by the sale of

Sidewalk to Microsoft.  It did not review the transition agreement

to determine what functions the transition team would be performing

for  Microsoft,  which,  according  to  the  agreement,  were

"substantially  similar"  to  the  services  Sidewalk  had  been

performing under Plaintiff.  It did not question Yee about the

---

[7]In <u>Herman</u>, the defendant appealed a district court ruling that he was
an employer under the FLSA, and thus liable for violations of the statute's
minimum wage, overtime, and record-keeping requirements.  The court found that
the Defendant had extensive knowledge of the FLSA, but had failed to
demonstrate "objectively reasonable grounds for believing that [the company]
was in compliance with the FLSA." <u>Herman</u>, 172 F.3d at 143.  It noted that
"the scenario in the case [was] somewhat different from the ordinary one"
because the most cases addressed situations "where an employer has knowledge
of his pay practices but is ignorant of the requirements of the FLSA," whereas
this case concerned an employer who understood FLSA's requirements but failed
to take the steps necessary to ensure compliance.  <u>Id.</u>

duties he was performing, even though he had been hired as a "placeholder" for Plaintiff. Although Cendant continues to assert (despite evidence to the contrary) that Yee essentially performed only wind-down functions, see, e.g. Tr. at 27, it did not investigate whether Plaintiff could perform these functions. Even after Plaintiff repeatedly asserted that Yee was temporarily performing her duties, see e.g. Def. Ex. 4, Cendant's counsel dismissed these claims as "posturing" rather than talking to Yee. In fact, Attorney Hotchkiss stated at the evidentiary hearing that Plaintiff would have been terminated regardless of whether she was qualified to provide similar services to Microsoft during the transition because Plaintiff's "qualifications [were] irrelevant to the decision the company made." Tr. at 49. In short, Cendant took minimal steps to ensure that it was complying with the FMLA. Its conduct was objectively unreasonable.

Cendant's conduct was objectively unreasonable irrespective of the "tumultuous" changes occurring at Cendant in early 1999. Although 300 Sidewalk employees were laid off during Plaintiff's leave, the transition agreement explicitly called for Yee, Plaintiff's temporary replacement, to be kept on through December 31, 1999. Moreover, there was nothing in the transition agreement suggesting that Plaintiff's position was to be terminated.[8]

_____

[8]In fact, although Plaintiff was one of the individuals who had recommended the sale of the Sidewalk unit to Microsoft, and had been active in planning the sale and transition up until her leave, nobody suggested to her that her position would be terminated. DOL Dec. at 25, 26. Only after she

This is not a case, as Defendant suggests, where company-wide changes or a reduction in force during an employee's leave indicate that the employee would have been terminated. In this respect, Defendant's reliance on O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349 (11th Cir. 2000) is unavailing. There, the Court held that the employer was not liable under FMLA for failing to reinstate an employee where the employee's name was on a list of 190 employees to be terminated as a result of a reduction in force, and where the employee never challenged this designation. 200 F.3d at 1354. Here, the transition agreement explicitly retained Plaintiff's temporary replacement and provided that Sidewalk's services during the transition would be "substantially similar" to the duties it performed prior to the sale.

Defendant's reliance on Hodge v. Honda of America Mfg., Inc., No. 2:00-CV-995, 2002 WL 1584274 (S.D. Ohio May 30, 2002) is similarly misplaced. In Hodge, the plaintiff was a door line assembly worker at Honda. While on leave due to a back injury, Honda implemented a New Model Changeover, which resulted in changes to the types of duties performed by employees on that assembly line. In light of these changes, and the plaintiff's physical restrictions, she was unable to return to the door line assembly line. Although the time it took to locate an alternative position

---

commenced her leave did Mr. Wargotz ignore Plaintiff's email and phone call attempts to keep herself current on the progress of the transition agreement, even though she had been kept up to date during previous FMLA leaves. DOL Findings ¶¶ 50-51.

for the plaintiff was contrary to the requirement that a plaintiff "shall be entitled on return" from leave to reinstatement, 29 U.S.C. § 2614(a)(1)(A), the court declined to impose liquidated damages. It noted that the plaintiff had provided no advance notice of her anticipated work date and that management's one month delay in returning her to work was attributable to finding her a position that would comport with her physical restrictions. 2002 WL 1584274, at *3,4. Indeed, management averred that in searching for a job that could accommodate her restrictions, it "personally observ[ed] various production processes, review[ed] manpower needs, and interview[ed] production supervisors concerning the nature of processes performed in their respective areas as they had been modified by the new model changeover." Id. at 4. Here, unlike in Hodge, it was not at all clear that Plaintiff was unable to perform the duties necessitated by the sale of Sidewalk. Moreover, in Hodge, the defendant's violation of FMLA's regulations (by delaying the plaintiff's return to work) was attributable to the affirmative steps and investigation it undertook to restore the employee to an equivalent position that would accommodate her physical restrictions.

Nor is this a case involving "an uncharted path regarding the permissible limitations on an employee's right to restoration," as

characterized by Defendant.  Def's. Mem. at 18 [Doc. No. 112].[9]
It was clear that under the FMLA and its regulations, an employee
who would have been terminated regardless of her leave enjoyed no
greater right to restoration than if she had not been on leave.  29
U.S.C. § 2614(a)(3).  Here, Defendant unreasonably determined that
Plaintiff was not entitled to reinstatement because it failed to
make a reasonable factual inquiry into whether or not her position
had been eliminated, not because it misunderstood the requirements
of the statute and the scope of an employee's right to restoration.
Perhaps after adequately investigating Plaintiff's and Yee's
respective job functions and the transition agreement, Cendant
would have nonetheless determined that Plaintiff's position had
been eliminated.   While this determination would have been
incorrect, Cendant might have been able to claim that it acted in
good faith and had reasonable grounds for its violation of the Act.
However, where Cendant undertook a minimal investigation and
dismissed Plaintiff's protestations that her position had not been
eliminated as mere "posturing", it cannot make such a claim.

Defendant's reliance on cases where employers reasonably and
in good faith misinterpreted the FMLA is unavailing.  For example,
in <u>Miller v. AT&T</u>, 83 F. Supp.2d 700 (S.D.W. Va. 2000), <u>aff'd</u> 250

[9]Defendant argues that when Plaintiff was terminated in 1999, there were
few cases interpreting the FMLA reinstatement provision that it could have
turned to for guidance, and "none involving the facts the company faced [in
this case]." Def's. Mem. at 25 [Doc. No. 112].

22

F.3d 820 (4th Cir. 2000), the court found that the defendant had "met its burden of proving that it acted in good faith and had reasonable grounds for believing its actions were proper" where the employer relied on DOL regulations stating that the flu was ordinarily not a serious health condition to conclude that its employee's flu-related absences were not covered by the "serious health condition" provision of the FMLA. Similarly, in <u>Thorson v. Gemini</u>, 96 F. Supp. 2d 882 (N.D. Iowa 1999), <u>aff'd</u> 205 F.3d 370 (8th Cir. 2000) the defendant erroneously determined that its employee's gastritis was not a "serious health condition" as contemplated by the Act. There, the Court noted that FMLA had only been in effect for six months, that the employer had tried to get a copy of the DOL regulations, and that even if he had obtained a copy, he would have found that upset stomachs and minor ulcers were ordinarily not "serious health conditions" qualifying for FMLA leave. <u>Id</u>. at 888-89. In <u>Cobb v. Contract Transport, Inc.</u>, No. 04-305, 2007 WL 1810482 (E.D. Ky. June 21, 2007), the company the plaintiff worked for as a truck driver lost its contract with the U.S. Postal Service after it was underbid by the defendant company. The plaintiff then began working for the defendant company, where he was terminated after an unexcused health absence. The defendant claimed that the employee was not entitled to FMLA coverage because he had worked for the defendant for less than twelve months, while the plaintiff claimed that the three years he worked for the

defendant's predecessor counted toward his FMLA eligibility under the theory of successor liability. Cobb v. Contract Transport, Inc., 452 F.3d 543, 547 (6th Cir. 2006). The district court ultimately concluded that liquidated damages were not appropriate where "no court in the country had found FMLA liability" under similar circumstances, and where the court's own grant of summary judgment in favor of the defendant (finding no successor liability) was overturned by the Sixth Circuit in a case of first impression. 2007 WL 1810482, at *2. In all of these cases, the employers reasonably misinterpreted the scope of FMLA coverage. Here, the Defendant understood the requirements of the Act, but failed to take reasonable steps to ensure it was in compliance with it.

Defendant also asserts that liquidated damages are inappropriate in this case because "cases awarding liquidated damages generally demonstrate a willful ignorance of the law or a general disregard for employee rights." Def's. Mem. at 19 [Doc. No. 112]. This ignores the Act's presumption that liquidated damages should be awarded as a matter of course, subject to the narrow exception in 29 U.S.C. 2617(a)(1)(A)(iii). Although lack of good faith may be easier to prove where an employer acted willfully, "that [an employer] did not purposefully violate the provisions of [the statute] is not sufficient to establish that it acted in good faith." Reich, 121 F.3d at 71; see also Nero, 167 F.3d at 929 n.4 (declining to read the "good faith" exception

24

together with the term "willful" in the statute of limitations provision of the Act.).

Finally, the Court rejects Defendant's argument that a liquidated damage award of $496,344 in this case is impermissibly punitive.

Under the FMLA, "double damages are the norm, single damages the exception." Reich, 121 F.3d at 71. Liquidated damages are presumed to be awarded to a prevailing FMLA plaintiff in an amount equal to "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation . . ." 29 U.S.C.§ 2617(a)(1)(A)(iii). An employer can escape this "otherwise mandatory call for liquidated damages," Thorson, 205 F.3d at 383, only by proving to the satisfaction of the court that it acted in good faith and with reasonable grounds. Id. (emphasis added). As explained above, Cendant has not met this difficult burden. Therefore, double damages are appropriate.

Liquidated damages are considered compensatory rather than punitive in nature. Reich, 121 F.3d at 71 (interpreting liquidated damages statute under FLSA). Defendant argues that any award Plaintiff receives in addition to her sizable economic damages award "would serve only to penalize the defendant and grossly overcompensate the plaintiff." Def's. Mem. at 2 [Doc. No. 112].

This argument ignores the fact that statute presumes doubling of an economic damages award, irrespective of how large that award

may be.  See, e.g. Palma, 2003 WL 22750600, at *2, *2 n.4

(discussing nearly a dozen FMLA and FLSA cases and noting that,

with the exception of one, the liquidated damages awards "were in

the exact amount of the backpay and prejudgment interest awarded by

the court or jury, as mandated by statute."). Because liquidated

damages are directly based upon a plaintiff's economic damages,

Cendant's comparison of the size of the award to other cases is

irrelevant.  In this case, Plaintiff was a highly paid executive

with almost fifteen years of experience and training at the time of

her termination.[10]  She had overall responsibility for Cendant's

Sidewalk obligations to Microsoft, including responsibility for a

$30,000,000 budget.  DOL Findings ¶¶ 19, 23.  She oversaw a sales

staff of 300 employees, including the senior vice president of

sales and the vice president of operations.  DOL Findings ¶¶ 16-17.

Liquidated damages are properly viewed as "compensation to the

employee occasioned by delay in receiving wages due caused by the

employer's violation of [the statute]."  Herman v. RSR Security

Servs, Ltd., 172 F.3d 132, 142 (2d Cir. 1999).  Here, six years

passed before Plaintiff received the wages and benefits wrongfully

withheld.  Liquidated damages are appropriate to compensate

Plaintiff for the lost value of the money she had been entitled to

---

[10]The Plaintiff graduated from Princeton University in 1984.  She worked
as a financial analyst for Merrill Lynch following her graduation.  She then
attended Stanford University's Graduate School of Business and received her
MBA in 1989.  DOL Findings ¶ 1.

during that time. <u>See</u> <u>Reich</u>, 121 F.3d at 71 (stating that "Congress provided for liquidated damages as a means of compensating employees 'for losses they might suffer by reason of not receiving their lawful wage at the time it was due'", <u>quoting</u> <u>Martin v. Cooper Elec. Supply Co.</u>, 940 F.2d 896, 907 (3d Cir.1991)). As the Tenth Circuit has noted, "the non-discretionary calculation of damages under the FMLA should not be considered a 'windfall,' but rather a congressional judgment, enforced by the courts, designed to compensate employees for the obscure damages that occur when one wrongfully loses wages, even if only temporarily." <u>Jordan v. U.S. Postal Serv.</u>, 379 F.3d 1196, 1201 (10th Cir. 2006).

## Conclusion

For the foregoing reasons, Plaintiff's motion for liquidated damages under the Family Medical Leave Act, 29 U.S.C. § 2617(a) is GRANTED in the amount of $496,344.[11]

SO ORDERED

                    /s/

ELLEN BREE BURNS

---

[11]This amount includes the economic damages suffered by Plaintiff, as well as $69,602 in pre-judgment interest, as calculated by the Connecticut State Department of Labor using the Connecticut statutory interest rate of 10 percent. <u>See</u> Conn. Gen. Stat. § 37-3a.

SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 15th day of February 2008.